VICTOR TALKING MACH. CO. et al. v. SONORA PHONOGRAPH CO.

(Circuit Court, S. D. New York. December 12, 1910.)

PATENTS (§ 328*)—INFRINGEMENT—GRAMOPHONE.
 The Berliner patent, No. 534,543, for improvements in talking machines, claims 5 and 35, *held* infringed.

In Equity. Suit by the Victor Talking Machine Company and United States Gramophone Company against the Sonora Phonograph Company. On final hearing. Decree for complainants.

See, also, 180 Fed. 777.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

183 F.—54

Horace Pettit, for complainants.
Waldo G. Morse, for defendant.

HOUGH, District Judge. The defendant is alleged to infringe claims 5 and 35 of the Berliner patent by making and vending the talking machine shown below:

It is unnecessary to recite the language of the claims in suit, or to recount the numerous decisions on this patent, for defendant admits that by them, from 140 Fed. 860, to 177 Fed. 248 (where all the intermediate cases are enumerated), the patent in suit has been sustained, wherefore the only defense here advanced is noninfringement. Defendant's position is that when Berliner filed his application the talking machine art was not new; that in that art flat discs containing sound records were known; that the reproduction of sound therefrom by the engagement of a stylus with a spiral sound-recording groove upon such discs was also known, and that in such reproduction of sound a loose mounting of the reproducing style, so that it would be readily guided by the record itself, had been shown to the world. This knowledge is said, and I think truly, to have been given the public especially by the Bell and Tainter patent (341,214), the other well-known inventions of Mr. Tainter, and the still earlier patents of Edison. The further argument is that although the validity of Berliner's invention must stand admitted, that the scope of that invention has not been so plainly shown as to cover defendant's device, while the final position taken is that said device does nothing that was not known before Berliner.

The machine asserted to infringe scarcely needs explanation, but the court's understanding of it may be thus stated: The illustration shows the usual revolving tablet capable of receiving a disc record of any commercial form; back of that tablet is a telescopic tube con-

nected with and forming a part of the amplifying horn. That tube is actuated by a half nut seen in engagement with a revolving shaft bearing a screw thread corresponding in gauge to the cutting of the nut. When the shaft is revolved the telescopic tube is advanced into the amplifying horn, with which it is in frictional engagement only. Attached to the tube is seen the tone arm, anteriorly connected with the tube by a universal joint, and terminating in the stylus resting in the groove of the disc record. The gauge of revolving shaft and half nut is 96 cuts to the inch, which is probably near the average gauge of commercial disc records, although the evidence shows them running from 72 cuts to 112. The tone arm of the machine has enough play through the universal joint to enable it to swing over about one-half of the ordinary commercial record; wherefore to cover the whole of such record the telescopic tube must advance toward the center of the disc, and thus compensate for the shortness of the arm. If the arm were longer the telescopic feature would be useless; if it were shorter the movement might require acceleration; but as shown it is of a length permitting the stylus to nearly reach the disc center, when the tube has passed into the horn as far as it can go.

The inquiry as to just what is the scope of the Berliner patent might be greatly prolonged by quotations from numerous decisions, but it is certainly fair to defendant, and seems sufficient for the purposes of this case, to adopt the definition of defendant's own expert, who gave it as his opinion that:

"The main feature of the patent in suit (Berliner's patent) as to the reproduction of sound appears to consist in the provision of apparatus by which the reproducer is fed across the record by the record groove and independent of other mechanical means. That is to say, prior to the patent in suit it was customary to feed the reproducer across the record or feed the record past the reproducer by mechanical means, a common form being the so-called screw feed. As an improvement upon both of these methods Berliner dispensed with the mechanical feed and depended wholly and entirely upon the record groove as a means of feeding the reproducer across the record."

While not so elaborate, it seems to me that this view is entirely in accord with the exposition of Hazel, J., in the original case (140 Fed. 863), and with subsequent efforts in the same direction in 158 Fed. 310, and 177 Fed. 254. For the purposes of this litigation the important part of the above description of the scope of Berliner's invention is that he "dispensed with the mechanical feed and depended wholly and entirely upon the record groove as a means of feeding the reproducer across the record." Starting from this text the defendant by its expert asserts that in defendant's machine—

"for the purpose of feeding the reproducer across the record a mechanical means is provided separate and independent of the record groove in the form of a screw shaft and half nut, the common type of the so-called screw feed. Under the action of this mechanical feed the reproducer, once started in the usual manner to play a record, *is positively driven by the feed across the face of the record*, to the limit of the thread on the screw shaft, and thereupon the feed ceases to act and a positive stop comes into action holding the reproducer at this point regardless of the length of the record groove or its position on the record disc. To express it in another way, the screw feed in this machine will appear to be controlling and to afford a *positive and certain means of propelling the reproducer across the face of the record separate*

*and independent of the record groove.* To provide for inequalities, differences in pitch of the feed screw and record spiral, and other uncertainties, the defendant * * * mounts the reproducer in a manner to have *slight play or yielding action* in order that it may adapt itself as may be required to the record groove while driven by the mechanical feed."

It is thus asserted as a description of defendant's method, and the reason for noninfringement, that the stylus of the machine pictured "is positively driven by the feed across the face of the record"; that the machine in question "affords a positive means" of so driving the reproducing stylus "separate and independent of the record groove"; and that the movement of the tone arm is no more than a "slight play or yielding action" necessary to provide for inequalities, etc., while the reproducer itself is being "driven by the *mechanical feed.*" These last two words really sum up the present litigation. Is the defendant's reproducer when in useful and intended operation actuated "by and in accordance with" the record, or is it actuated *by* the screw shaft and half nut and *in* (not in accordance with) the record groove?

The words just used, "useful and intended operation," are most important, for a positive actuation of the stylus when the machine is not producing sound in the manner intended by its makers and sellers, cannot be regarded as a "mechanical feed." The Hoschke machine (158 Fed. 309; 177 Fed. 248), with its spring constantly pulling at the tone arm, would propel (or rather draw) the stylus across the record face when the disc tablet was not in revolution, but that did not make the spring a mechanical feed, when the tablet was revolving and the machine doing what it was intended to do. So here, the screw shaft and nut illustrated above will propel (that is, push) the stylus across the disc when the movement arc of the tone arm is exhausted, and the tablet is not in revolution; the stylus is then "mechanically fed" but such feeding has nothing to do with the "useful and intended operation" of the device.

Defendant's machine is made to give forth recorded sound with the disc record turning around, and the tone arm free to swing (even without movement of the telescopic tube) as above stated; wherefore it is also beside the mark to point out (as has been done) that this machine will reproduce sound with a rigid tone arm, screwed or soldered to the tube, provided the stylus be loosely mounted to compensate for "drunkenness" in the record, and the gauge of the record be the same as that of the screw shaft (96 to the inch). Such a device would be a true mechanical feed, for it would be by the actuation of the screw shaft alone, that means or power is provided for enabling the stylus to travel from periphery to center of the disc record. But the argument seems idle, inasmuch as the question is not what a machine with a rigid arm would do, but what is done by this machine with a short swinging arm.

Similarly, it is not useful to demonstrate that defendant's machine cannot reproduce from a record which begins at the center rather than the circumference of the disc. This is because the arc of the tone arm's movement is all (or nearly all) to the left (looking at the illustration) of the universal joint. Admittedly the complainant's well-known apparatus will reproduce from a disc with spiral record read-

ing either way, because of the greater area of the swing of its longer arm: but if defendant's machine does the same thing in the same way, reading one way as does complainant's, then infringement is not avoided as to that way—or method of operation—because the infring- ing machine is not as good or complete as the patentee's. Half an infringement is just as thoroughly an infringement (as far as it goes) as a slavish and complete copy.

It is necessary, then, to consider the normal and intended operation of the apparatus presented. What is it that in machines covered (un- der repeated decisions) by Berliner's patent is actuated "by and in ac- cordance with" the record? And what is it that in undoubted me- chanical feed machines (such as the Edison phonograph) is positively driven by a force wholly outside of and unconnected with the record? It is always the stylus; if that be mechanically driven past the irregu- larities of the sound groove, it is mechanically fed; but if that stylus is not driven at all, but permitted by its wide radius of swing to follow a groove in a disc which is itself mechanically fed under the stylus, then the stylus is said to be "propelled  *  *  *  by and in accordance with" the record—a result and distinction reached in a line of cases now much too long to cavil at.

Applying this to any model of defendant's apparatus, it is apparent that the mechanical device, or feed contained in screw shaft and nut does not operate upon the stylus at all, but on the tone arm, and serves merely to reposition that part of the machine, and extend the area of its operation, but at any given movement of operation, the swinging arm and stylus is doing just what is described in claims 5 and 35 of the patent in suit, and doing it in exactly the same way. The truth of this seems easily tested. If the nut be disengaged, the machine will play until the tone arm's limit of movement is reached; if the rev- olution of the record be stopped, but the so-called mechanical feed continue in operation, the stylus does not stir until again its arc of movement is exhausted, and then it only scratches.

My conclusion is that the assertions made by defendant's expert are not borne out by the evidence. The reproducer is not positively driven by the feed across the face of the record, nor does the machine af- ford means of so propelling that reproducer separate and independent of the record groove. On the contrary, the stylus, when doing what the machine is sold to do, is always following the groove in its spiral path from circumference to center. What makes it do so is the groove itself. The mechanical device (misnamed a "feed") attached to the apparatus is merely a moving pivot for the tone arm. The 96 gauge of nut and shaft is wholly unnecessary and unessential; it might be 20, or it might be dispensed with altogether, and the telescopic tube pushed in with the finger—one push given when about half way through an ordinary record would be enough. The act would not dis- turb the stylus, would reposition the anterior end of the tone arm, and during the whole operation the reproducing point would continue to follow the groove just as does Berliner's.

Complainants may take a decree as prayed for.